IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 1:18-cv-0273-RM-MEH

Crystal Hathaway,
Dios Del Mar Petroleum Company, Inc.,

    *Plaintiffs*,

    v.

Avi Dan,
Alpha Energy Group, LLC,

    *Defendants*.

___

**ORDER**
___

    This case involves determination of the scope of royalty interests, if any, transferred between the parties with respect to certain oil and gas wells. It is before the Court upon review of Defendants' Motion to Dismiss (Motion, ECF No. 23; Reply, ECF No. 27), to which Plaintiffs responded. (Response, ECF No. 25.) Magistrate Judge Hegarty considered the Motion and recommended that it be granted in part and denied in part, finding that every claim should remain except for Count One, which asserts breaches of contract and of the covenant of good faith and fair dealing. (Recommendation, ECF No. 28, at 12–15; *see also* Am. Compl., ECF No. 18 ¶ 95–103.) Plaintiffs filed the only objection, arguing that dismissal of Count One would be improper. (Objection, ECF No. 29, at 1.) Defendants did not respond.

    The Court has reviewed these filings, together with the relevant portions of the record. Upon consideration of the Motion, Response, Court file, Recommendation, and the applicable law, the Court adopts the Recommendation for the reasons that follow.

## I. BACKGROUND

The Court takes the following facts from the Amended Complaint (ECF No. 18) and attachments to the Motion briefing[1] in the light most favorable to Plaintiff.

### A. Hathaway's Companies and Their Oil & Gas Interests

There are two types of oil and gas ownership interests relevant here: working interests and overriding royalty interests. Working interests are true ownership interests in a lease or well and require payment of expenses to drill and operate the well. By contrast, overriding royalty interests are carved out of working interests; they entitle their owner to production revenue without her having to drill or otherwise operate the underlying well. (Am. Compl. ¶ 10.)

Plaintiff Crystal Hathaway owned working and royalty interests in oil and gas wells in Weld County, Colorado and controlled two entities: Malu Lani Oil & Gas Company ("Malu Lani") and Plaintiff Dios Del Mar Petroleum Company, Inc. ("DDM"). (*Id.* ¶¶ 9, 12.) She had all her royalty interests in Malu Lani and all her working interests in DDM (except for a portion of royalty interests in "Wells Ranch," which remained in DDM). (*Id.* ¶¶ 11–12, 35.) In August 2012, DDM sold 91% of its working interests to third-party 1280 Horizons, LLC, who assigned some of those working interests to Defendant Avi Dan. (*Id.* ¶¶ 13, 15.) DDM transferred the remaining 9% of its working interests to Malu Lani. (*Id.* ¶ 14.)

In August 2014, Ms. Hathaway instructed her personal assistant to transfer the remaining working interests from Malu Lani back to DDM, but to leave untouched the royalty interests held in Malu Lani. (*Id.* ¶¶ 23–24.) On October 24, 2014, contrary to those directions, the assistant

---

[1] Both parties filed various agreements and other papers at issue here, not in their pleadings, but in their briefing on the Motion. (ECF Nos. 23-2, 23-3, 23-3, 23-4, 23-5, 23-6, 25-1.) As the Recommendation correctly pointed out, these materials may be considered at this juncture because they are central to, and explicitly referenced in, the Amended Complaint. *See, e.g., GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

recorded a form conveyance that transferred to DDM "one hundred percent of [Malu Lani's] working interests . . . and any other interests of any kind and nature . . . in Weld County, Colorado." *Id.* ¶ 26.

**B. Plaintiffs' First Transaction with Defendants**

In October 2014, Dan contacted Hathaway about selling the remaining working interests that she held in DDM, and they discussed a potential purchase price of $450,000.00. (*Id.* ¶¶ 19–20.) Hathaway clarified that she did not wish to sell her royalty interests. (*Id.* ¶ 21.) From November 2014 to January 2015, Hathaway and Dan discussed sale of the working interests over the phone. (*Id.* ¶¶ 33–35.) In each call, Hathaway reiterated, and Dan acknowledged, that the deal would involve only working interests. (*Id.* ¶¶ 33–37.) Before they reached a final agreement, Dan performed a title search and learned that the October 24, 2014 conveyance from Malu Lani to DDM transferred both the royalty interests and the working interests. (*Id.* ¶ 40.) Notwithstanding this knowledge, Dan informed Hathaway that his title search revealed that her royalty interests remained in Malu Lani. (*Id.* ¶ 41.)

Meanwhile, several third-party well operators—keeping track of title in order to collect operating expenses and make revenue payments—contacted Hathaway's assistant to inquire whether Hathaway intended to include the royalty interests in the October 24, 2014 conveyance. (*Id.* ¶¶ 29–30.) Although Hathaway's assistant informed them that only the working interests had been transferred, Hathaway executed a correction conveyance between Malu Lani and DDM on January 20, 2015 to clarify that Malu Lani did not transfer its royalty interests to DDM. (*Id.* ¶ 31.) The conveyance was recorded on January 30, 2015 ("Corrective Conveyance"). (*Id.* ¶ 32.)

In January 2015, Hathaway and Dan reached a final agreement to sell the working interests for $450,000.00. (*Id.* ¶ 39.) On January 21, 2015, Dan flew to Denver and asked

Hathaway to meet him at a hotel immediately to execute the sale and transfer documents and that he would cancel the sale if she did not meet him that afternoon. (*Id.* ¶¶ 44–45.) When Hathaway arrived, Dan orally confirmed that he was purchasing Hathaway's remaining working interests. (*Id.* ¶ 48.) He then told Hathaway that he had to travel for business, so he drafted a quick letter agreement memorializing the terms of the sale. (*Id.* ¶ 52.) The letter agreement stated that Hathaway and DDM agreed to sell Dan and Defendant Alpha Energy Group, LLC "100% of the working interests and all rights and title [to royalty interests] owned by [DDM and Hathaway] in [ ] Weld County." (*Id.* ¶ 53; January 21, 2015 Letter, ECF No. 23-2.) Hathaway objected to that language as broadly including royalty interests and expressed that she needed to have an attorney read the agreement. (Am. Compl. ¶ 55.) Dan responded that there was no such need because, to his knowledge, DDM only held working interests (other than the Wells ranch royalty interests), so there were no other interests being conveyed. (*Id.* ¶ 59.) He reassured Hathaway that he would help her to fix title in the event any non-working interests had been inadvertently conveyed by DDM pursuant to the letter agreement. (*Id.* ¶ 60.) Relying on these statements, Hathaway executed the January 21, 2015 Letter. (*Id.* ¶ 61.) The parties then executed an assignment reflecting transfer from DDM to Alpha Energy "all right, title and interest" in the aforementioned properties. (Original Assignment, ECF No. 23-5.)

### C. Plaintiffs' Second Arrangement with Defendants

On January 22, 2015, the parties discussed the sale of the separate Wells Ranch royalty interests from DDM to Alpha Energy. (*Id.* ¶ 67.) Hathaway agreed to sell these interests to Mr. Dan, and the parties entered into a second letter agreement, which stated that "they will discuss and mutually agree to a fair price for both parties on the sale of the Wells Ranch [royalty interests] by [DDM] and Crystal Hathaway to Avi Dan." (*Id.* ¶ 68; January 22, 2015 Letter, ECF

No. 23-3.) The January 22, 2015 Letter clarified that this transaction would be separate from the earlier January 21, 2015 Letter. (Am. Compl. ¶ 68.) Dan informed Hathaway that if the parties could not agree on a price for the Wells Ranch royalty interests or if Dan failed to pay the price within a reasonable time, he would re-convey those interests to DDM. (*Id.* ¶ 69.) Dan provided Hathaway with a signature page, which Hathaway could use to re-convey the interests in the event the parties did not agree on a price ("Re-Assignment"). (*Id.* ¶ 72.)

**D. The Corrected Assignment, Purchase Agreement, and Subsequent Conduct**

Because of the interim recording of the Corrective Conveyance between Manu Lani and DDM on January 30, 2015, Hathaway and Dan met again on February 5, 2015 to execute a corrected assignment ("Corrected Assignment") and a purchase and sale agreement ("PSA"). (*Id.* ¶¶ 75, 80; PSA, ECF No. 23-4.) The Corrected Assignment included the same interests that were conveyed in the original assignment as well as the Wells Ranch royalty interests. (Am. Compl. ¶ 75.) The parties executed this correction because Ms. Hathaway had recorded the corrective conveyance between Malu Lani and DDM ("Corrective Conveyance") on January 30, 2015, and the parties intended to clarify that the only interests transferred to Dan and Alpha Energy were those held in DDM as of February 5, 2015. (*Id.* ¶¶ 77–79.) They signed the formal PSA to state that DDM was selling all of its working and royalty interests as of that date. (*Id.* ¶ 80; ECF No. 23-4, at 2.)

Between February and July 2015, Hathaway attempted to contact Dan several times to discuss a price for the Wells Ranch royalty interests. (*Id.* ¶ 81.) However, Dan did not respond, leading Hathaway to believe that the parties would not come to an agreement on price. (*Id.* ¶¶ 81–82.) On July 24, 2015, she recorded a conveyance reassigning the Wells Ranch interests to DDM using the Re-Assignment signature page Dan had provided. (*Id.* ¶¶ 82–83.) Dan objected

to Hathaway's use of the signature page, and he claimed that the $450,000.00 he paid pursuant to the January 21, 2015 Letter and the February 5, 2015 PSA was consideration for the Wells Ranch royalty interests. (*Id.* ¶ 84.)

Meanwhile, in February and March 2015, Dan had begun telling well operators that he purchased all of Hathaway's royalty interests. (*Id.* ¶ 88.) Although Hathaway informed the operators that she is entitled to the royalty payments, the well operators suspended payments until the parties determine the legal ownership of the interests. (*Id.* ¶¶ 86–87.) When Hathaway asked Dan to re-convey the inadvertently transferred royalty interests, Dan replied that it was never his intent to re-convey any of the overriding royalty interests to Hathaway. (*Id.* ¶ 91.) He also told Hathaway that he was keeping the royalty interests because he believed he had received a bad deal in a separate transaction between him and 1280 Horizons, LLC. (*Id.* ¶ 93.)

## II. ANALYSIS

Based on these allegations, Plaintiffs organized the Amended Complaint into six claims: (1) breach of contract and breach of the implied covenant of good faith and fair dealing, (2) reformation, (3) promissory estoppel, (4) unjust enrichment, (5) false representation arising out of six statements, and (6) declaratory judgment. (Am. Compl. ¶¶ 95–136.) Defendants moved to dismiss the first five of these, arguing that they failed to state plausible claims for relief under Fed. R. Civ. P. 12(b)(6). They also argued that the Court should decline to hear the claim for declaratory judgment. Magistrate Judge Hegarty recommended that only Count One be dismissed, and that Count Five could not be based on certain of the facts alleged therein.

Plaintiffs timely objected to the dismissal of Count One, and the Court reviews the Recommendation on those grounds *de novo*. Fed. R. Civ. P. 72(b)(3). Because no other objection has been lodged, and the time to do so has expired, the Court will not disturb the

Recommendation on any other claim absent clear error. Fed. R. Civ. P. 72(b) advisory committee's note to 1983 addition ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."); *see also Summers v. State of Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) ("In the absence of a timely objection, the district court may review a magistrate's report under any standard it deems appropriate."). Finding no clear error on the balance of the Recommendation, the Court considers only the claim for breach of contract and breach of the duty of good faith and fair dealing.

To state a claim for breach of contract, Plaintiffs must allege "(1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal citations omitted). In the Amended Complaint, Plaintiffs alleged that "Defendants breached the agreements by, among other things, failing to purchase the Wells Ranch overriding royalty interests and failing to re-convey the non-working interests to Plaintiffs." (Am. Compl. ¶ 99.) With regard to the breach of the covenant of good faith and fair dealing, Plaintiffs re-allege the same conduct in different terms: "Defendants also failed to exercise their discretion by failing to convey back to Plaintiffs the [non-Wells Ranch] overriding royalty interests and by contesting the Re-Assignment of the Wells Ranch overriding royalty interests to Hathaway." (*Id.* at 101.) The magistrate judge found that Plaintiffs had failed to allege non-performance of any contractual term and were invested with no discretionary undertaking pursuant to which they could exercise bad faith. The Recommendation also found that to the extent that they relied upon oral representations, Plaintiffs' contract claim was barred by the statute of frauds. In their Objection, Plaintiffs retort that they have adequately

stated a claim because Defendants: (A) continued to falsely assert rights over the non-Wells Ranch royalty interests (or improperly used "discretion" to claim those royalty interests under a false color of title) despite Dan's oral representations that he would re-convey them if they had been inadvertently transferred; and (B) wrongfully contested the re-conveyance of Wells Ranch interests to Plaintiffs. (Objection at 12–17.) The Court finds neither argument persuasive.

### A. To the extent that Defendants falsely claim a right to the non-Wells Ranch royalty interests, those false claims are not cognizable as breaches of contract or of the duty of good faith and fair dealing.

"To prevail on a claim for breach of contract, a party must show that there was a contract in existence and that one party failed to perform *some term* of the contract." *Spencer Investments, Inc. v. Bohn*, 923 P.2d 140, 144 (Colo. App. 1995) (emphasis supplied), *as modified on denial of reh'g* (Nov. 9, 1995). Implicit in any contract is a duty of good faith and fair dealing. *See, e.g.*, *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo. App. 1994); *see also Larese v. Creamland Dairies, Inc.*, 767 F.2d 716, 717 (10th Cir. 1985) (explaining that the franchisor-franchisee relationship is one that requires the parties to deal with one another in good faith and in a commercially reasonable manner); *see generally* Restatement (Second) of Contracts § 205 (1981); 3 Arthur Linton Corbin, *Corbin on Contracts* § 561, at 278 n.2 (1960). The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations. *See State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 168 (Colo. 1993). Good faith performance of a contract involves "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Wells Fargo*, 872 P.2d at 1363 (citation omitted). "The application of the reasonable expectations doctrine often 'fails to give effect to some hornbook rules governing the construction of contracts,' including 'the precept that contracts which are

free from ambiguity are to be enforced as written.'" *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498–99 (Colo. 1995), *as modified on denial of reh'g* (Jan. 16, 1996) (quoting *Davis v. M.L.G. Corp.*, 712 P.2d 985, 990 & n. 7 (Colo. 1986)). Nonetheless, adherence to this principle promotes "the central policy underlying contract law, that of construing contracts so as to effectuate the parties' intentions." *Davis*, 712 P.2d at 991.

Reviewing the Original Assignment, Wells Ranch Letter, and PSA, the Recommendation found no provision in any of these writings requiring Defendants to re-convey royalty interests. But the Objection intimates that this fails to consider the whole universe of the parties' written obligatory relationship.[2] Based on all of the relevant documents, Defendants conclude that "only working interests were conveyed from [DDM] to Alpha Energy as a part of the parties' comprehensive agreements," and "the breach of contract/implied covenant claim is based on Defendants' continued assertion of a false claim to title in the overriding royalty interests . . . (and not merely failure to re-convey interests back to Plaintiffs)." (Objection at 12, 14) (parentheses in original).

However, there is no question that the express terms of the parties agreements alone—even in the expanded universe of documents Plaintiffs ask the Court to consider—do not require Defendants to re-convey any non-Wells Ranch royalty interests. Of course, the writings convey certain interests *from* Plaintiffs to Defendants, but here is no express clawback or other obligation imparted to Defendants to return any interest or refrain from "asserti[ng] a false claim" to title in the same. Thus, the Court is convinced, as was the magistrate judge, that Plaintiffs have failed to allege *per se* breach of any written term. Therefore, the issue here is

---

[2] Plaintiffs make clear that the breach of contract claim is based only on the writings. (Objection at 14 ("The Statute [of Frauds] does not apply because Plaintiffs are asserting Defendants breached written contract documents – the January 21 and 22, 2015 letter agreements, the PSA, the Original Assignment, and the Corrected Assignment.").) From that statement, the Court reads the Objection as seeking this Court to additionally consider the Corrected Assignment on the non-Wells Ranch contract claim.

whether, and to what extent, the Court may employ the good faith and fair dealing doctrine to imbue Defendants with an obligation not expressly written.

Despite its notion that the duty of good faith and fair dealing is implicit in every contract, the doctrine is often invoked when

> one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. . . . The concept of discretion in performance refers to one party's power after contract formation to set or control the terms of performance. Discretion occurs when the parties, at formation, defer a decision regarding performance terms of the contract. . . . Good faith performance cases typically involve arm's-length transactions, often between sophisticated business persons. The relative strength of the party exercising discretion typically arises from an agreement of the parties to confer control of a contract term on that party. The dependent party then is left to the good faith of the party in control.

*Amoco Oil Co.*, 908 P.2d at 498–99 (citing *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873, 876 (5th Cir.), *cert. denied*, 493 U.S. 978 (1989) (other internal citations omitted).

The transaction between the parties here was instant, isolated, and did not create an ongoing or structured relationship between them. For a specified price, Plaintiffs delivered to Defendants their interests in certain oil and gas wells. After signing, Defendants did not, and still do not, have unilateral discretion to set the parameters of the deal or the scope of their performance. Either Plaintiffs transferred only working interests in the non-Wells Ranch wells to Defendants, or they conveyed *both* working and royalty interests in the same. The scope of the transaction res is either for resolution between the parties or a question suited for another claim. But in either circumstance—despite whether Defendants or Plaintiffs are the true owners of the royalty rights at issue—Defendants have no continuing implied contractual obligation of good faith with respect to this particular transaction and the parties have no continued common purpose with respect to which the Court could imply discretionary responsibilities. Finally, while

Plaintiffs assume, without citation, that they do, the Court is not convinced that "covenant[s] of good faith and fair dealing appl[y] to [non-contractual] oral promises." (Objection at 18.) Reasonable reliance on non-contractual oral promises is the province of promissory estoppel, and Plaintiffs have been allowed to maintain their claim alleged to that effect.

### B. Defendants' contest of Plaintiffs' re-assignment of the Wells Ranch interests is not a breach of a contract.

The Amended Complaint alleges that the parties convened to discuss sale of the Wells Ranch interests—which was to be a transaction wholly separate from the working interests discussed above—and clearly bases its breach claim on Defendants' "failing to purchase the Wells Ranch overriding royalty interests." (Am. Compl. ¶¶ 95–99.) But as the Recommendation correctly pointed out, "agreements to agree are generally unenforceable" and, at any rate, the January 22, 2015 letter upon which the breach claim was based did not contain a price term—a condition precedent to the formation of a valid contract for a conveyance of an interest in land. (Recommendation at 13–14 (citing cases).)

Rather than dispute this clear law, Plaintiffs retort with an exceedingly muddled theory of what contract they believe was actually formed and how the same was allegedly breached. First, they clarify that they "are not asking the Court to set a price or require Defendants to purchase the Wells Ranch interests." (Objection at 16.) Instead, they argue that there was a contract "consist[ing] of the January 22, 2015 letter agreement, the Corrected Assignment, and the Re-Assignment" which meant that "either a fair price would be agreed on in the future or the interests would go back to Plaintiffs." (*Id.* at 16–17.)[3] They go on: "The alleged breach of the

---

[3] As if to say, "the parties' contract is that they will either form a contract or they will not." The loosely formed agreement, as it is now characterized, that Plaintiffs attempt to transform into a full-blown contract in their Objection is not sufficiently definite such that the Court could confidently say that it reflects a meeting of the minds. What attempts to reach a price term are sufficient? What price range is reasonable? How long must Plaintiff wait before it may file the Re-Assignment? Do Defendants have any recourse if Plaintiff gives up on

Wells Ranch documents was not the failure to reach agreement on price or Defendants' failure to purchase the Wells Ranch interests, but was Defendants' improper contesting of the Re-Assignment" by claiming the Re-Assignment signature page was forged or recorded without Defendants' consent. (*Id.* at 17–18.) Thus, by Plaintiffs construction, the contract was a mutual understanding that Defendants would not be allowed to keep certain interests if they never agreed on an amount to pay for them, and Defendants breached that understanding by telling third-parties that Plaintiffs should not have been allowed to keep them. This theory is incomprehensible.

    First, as Plaintiffs agree, there never was a final contract for the purchase of Wells Ranch interests between the parties, but only an agreement to continue further negotiations.[4] This is clearly evidenced by the mechanisms the parties put in place with respect to the prospective deal. The Re-Assignment signature page was nothing more than a hostage to be held by Plaintiffs for use at their option in the event that no agreement could be reached. Plaintiffs themselves recognize this:

> the signature page to the Re-Assignment was an essential part of the parties' written agreement, and it evidences the parties' mutual intent that, in the event that in the event a price for the Wells Ranch interests could not be mutually agreed upon, instead of Defendants retaining those interests for no consideration they whould [sic] be returned to Plaintiffs.

(*Id.* at 18.) Moreover, the conduct between the parties cannot be interpreted as formative of a separate contract that required Dan to refrain from contesting Plaintiffs' right to file the Re-Assignment. To the extent that Plaintiffs believe this conduct interfered with their business

---

    negotiations? "Here, the alleged oral [and written] contract leaves all terms and conditions in doubt." *Stice v. Peterson*, 355 P.2d 948, 952 (Colo. 1960).

4   *See, e.g.*, Objection at 17 ("Hathaway attempted for approximately six months to reach with Dan an agreement on the price for the Wells Ranch interests, *but no agreement was reached*.") (emphasis supplied).

12

relationships or their right to collect revenues, such harm may sound in separate tort, but it certainly does not flow from any failure by Defendants to meet contractual obligations.

Finally, where there is no contract, there is no breach of the implied duty of good faith and fair dealing. Unsatisfied, Plaintiffs attempt to tease their claim in that direction by averring, with the appropriate buzz words, that "Defendants failed to exercise their discretion . . . by contesting the Re-Assignment of the Wells Ranch overriding royalty interests to Hathaway." (Am. Compl. ¶ 101.) This conclusion is unsupported by anything on the record, and the Court is unable to understand what discretion—if any—Defendants were allegedly given, especially when the choice to file the Re-Assignment rested with Plaintiffs at their sole election. Plaintiffs have failed to state a claim for breach of contract.

## III. CONCLUSION

For the foregoing reasons, the Court **ADOPTS** the Recommendation (ECF No. 28) in full and **OVERRULES** Plaintiffs' Objection. (ECF No. 29.) Count One of the Amended Complaint (ECF No. 18) is **DISMISSED** with prejudice. Count Five of the Amended Complaint is **DISMISSED** insofar as it is based on Dan's alleged representations set forth in the Amended Complaint, ECF No. 18 ¶ 121(a), (c), (d), and (e).

DATED this 20th day of March, 2019.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge